## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE

| | |
|---|---|
| **JACQUELYN D. AJOSE on behalf of herself)** <br> **and all others similarly situated,** ) <br> ) <br> ) <br> **Plaintiffs,** ) <br> ) <br> **v.** ) <br> ) <br> ) <br> **INTERLINE BRANDS, INC.** ) <br> **Defendant.** ) <br> ) | **Case No.** <br><br><br><br><br> **DEMANDED FOR JURY TRIAL** <br> **COMPLEX LITIGATION** |

## CLASS ACTION COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

Plaintiff, Jacquelyn D. Ajose, by her designated attorneys, individually and on behalf of all others similarly situated, for her class action complaint, allege as follows based upon personal knowledge, the investigation of her counsel, information and belief, and publicly available information:

## NATURE OF THE ACTION

1.     This action exposes the latent defects with Flexible Plumbing Toilet Connectors ("Toilet Connector") that Defendant Interline Brands, Inc. purchased in China, without testing or inspection, and injected into the U.S. marketplace.

2.     A Toilet Connector connects a water fixture shut-off valve to the bottom of a toilet. To permit water flow into the toilet tank, a Toilet Connector connects to the base of the toilet using a plastic coupling nut.

3.     Beginning in 2002, Interline purchased Toilet Connectors from China with uniformly defective plastic coupling nuts and injected them into the U.S. market. As a

result, these Toilet Connectors pose a substantial risk of failure permitting the unrestricted flow of water causing catastrophic water damage to property.

4.     Interline is a direct marketer and distributor of a broad line of products, including plumbing supplies.  Interline does not manufacture products, but instead uses third-party manufacturers largely in China to provide it with the products it distributes in the United States.

5.     Interline sells an exclusive brand of plumbing products under its trademark, DuraPro tubular products.  Interline's DuraPro line includes Toilet Connectors with plastic coupling nuts.

6.     Interline has known about the defects with these Durapro Toilet Connectors for years.  Indeed, there are presently at least 218 active claims by property insurers against Interline for subrogation payments regarding reimbursement for property damages caused by failed plastic coupling nuts.  Those claims, in total, allege more than $7.8 million in property damage.

7.     Rather than disclose, warn, or replace these defective Toilet Connectors, Interline has ignored this mounting problem, and exposing Plaintiff and the putative Classes to a substantial risk of significant property damage.

8.     Plaintiff and the Classes have suffered, and will continue to suffer, injury-in-fact and a loss of money as a direct result of Defendants' conduct.  Each Class Member has either expended money to repair property damage caused by the defective Toilet Connector, has paid for a defective Toilet Connector when they otherwise would not have, or will be caused to expend money to replace the defective Toilet Connectors once these defects are publicly known.

9.     This action seeks to both compensate those who have already suffered damages caused by the defective plastic coupling nut (like Plaintiff) and minimize any future damages by publicly disclosing the existence of the defects and establishing a protocol to remove them from properties.

10.     The central issue raised herein - whether Interline's Toilet Connectors are defective - is common to the members of each proposed Class. There is an economy to class treatment of this central question because its resolution has the potential to eliminate the need for repeated litigation related to the Toilet Connectors' alleged defects and the reasons for its repeated failure.

## JURISDICTION

11.     This Court has jurisdiction over this litigation pursuant to 28 U.S.C. § 1332(d), as the matter is brought as a class action under Rule 23 of the Federal Rules of Civil Procedure, and the sum of the amount in controversy exceeds $5,000,000. The requirement of minimal diversity is met as the dispute is between a citizen of Pennsylvania and a Defendant from a different state. *See* 28 U.S.C. § 1332(d)(2)(A).

12.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because during the relevant period Interline Brands shipped the Toilet Connectors directly from China to its warehousing facility in Nashville, TN located at 2701 Eugenia Avenue, where it then re-distributed the defective Toilet Connectors throughout Tennessee, and the United States, generally. All of the witnesses and documents related to the import of these defective Toilet Connectors are located in Tennessee.

## PARTIES

**Plaintiff:**

13.     Plaintiff Jacquelyn D. Ajose is an adult citizen and resident of the State of Pennsylvania, who resides in Philadelphia.   On June 2, 2014, after returning home, Plaintiff Ajose discovered that Interline's DuraPro brand Toilet Connector failed in a third floor bathroom causing water to flood through the first, second, and third floors of her home.

 

**Damage to Plaintiff Ajose's Home After Failure**

14.     Plaintiff Ajose's DuraPro brand Toilet Connector with fractured plastic coupling nut is pictured below still affixed to the base of the toilet:



**Defendant:**

15.     Defendant, Interline Brands, Inc. is a New Jersey corporation with its principal place of business in Jacksonville, Florida. Interline is a publicly traded (NYSE: IBI), $1.6 billion direct marketer and distributor of broad line of hardware, plumbing and heating equipment for use by facilities, professional contractors, and hardware retailers. Interline does not manufacture products, but instead uses third-party manufacturers largely in China to provide its products. Interline has a distribution network that is comprised of 68 distribution centers throughout the United States and Canada.

16.     During the relevant period (2002-2013), Interline used its facility in Nashville, Tennessee to receive direct shipments of the defective Toilet Connectors from China. Interline then distributed the defective connectors from Nashville throughout Tennessee and the United States, generally.

## INTERLINE'S WRONGFUL CONDUCT

### A. INTERLINE'S TOILET CONNECTORS

17.     Interline sells an exclusive brand of plumbing products under the trademark, DuraPro tubular products. Interline's DuraPro line includes Toilet Connectors with plastic coupling nuts for installation in homes and commercial properties, alike. Interline's specific intention and purpose is that these Toilet Connectors be installed by builders, plumbers, and consumers in homes, commercial properties, and other dwellings throughout the United States. In so doing, Interline represented that the DuraPro Toilet Connectors were safe, of merchantable quality, and fit for their intended and reasonably foreseeable uses.

18.     As detailed below, Interline knew of the repeated failures with the Chinese made DuraPro Toilet Connectors, but failed to publicly disclose that they were unsafe and posed a substantial risk of failure resulting in catastrophic water damage to property.

19.     Prior to the introduction of these flexible Toilet Connectors, generally, the connection between a water shut-off valve and a toilet had required a hard pipe connection. A section of rigid metal tubing would be cut to the appropriate length with metal coupling assemblies on both ends of the tubing to connect the property's water shut-off valve to the toilet.

20.     Flexible Toilet Connectors eliminated the need for the customized cut necessary to fasten rigid metal tubing between the shut-off valve and toilet. Toilet Connectors are manufactured in a variety of lengths (12" – 20") and made available for sale at large, to builders, plumbers, commercial property managers and consumers at hardware stores and retail chains for prices ranging from $5 to $15 per unit.

**B.     INTERLINE PURCHASES SUB-STANDARD TOILET CONNECTORS FROM CHINA**

21.     Interline began distributing Toilet Connectors in the United States in and around 1993. Prior to 2002, Interline purchased Toilet Connectors made in the United States. In 2002, for cost reasons, Interline began sourcing its DuraPro Toilet Connectors from China.

22.     In order to do so, initially, Interline enlisted the assistance of Linx, Ltd ("Linx"). Linx is based in Rhode Island and markets plumbing products to distributors like Interline. Linx operated a shipping and receiving facility in Shanghai, China for exporting Chinese-made products to the United States.

23.     Pursuant to a "supply partnership agreement" between Linx and Interline, Linx procured a Chinese manufacturer to supply Interline with inexpensive Toilet Connectors for re-sale in the United States.

24.     Linx then purchased the defective Toilet Connectors in China on Interline's behalf, and then used Linx's Shanghai facility to ship the Toilet Connectors to Interline's national distribution center in Nashville, Tennessee. From this facility, and others, Interline distributed the Toilet Connectors across the United States.

25.     By its own admission, Interline did *not* do any testing on the Chinese made Toilet Connectors Linx procured prior to distributing them in the United States. During a recent deposition, Interline's corporate designee, Joseph Cangelosi, III (Interline's Quality Assurance Manager), testified on February 6, 2013, as follows:

> Q.     Before deciding to acquire and distribute the DuraPro brand [toilet connectors from China], did you or anybody at Interline ask to see the design drawings and schematics for the [toilet connectors]?
>
> A.     **No.**
>
> Q.     And I am going to assume [Interline] didn't do any torque tests of the coupling nuts.
>
> A.     **No, that's correct, we did not.**

26.     Linx and Interline ended their relationship in 2005 after Linx's Chinese supplier refused to sell Linx anymore Toilet Connectors.

27.     Afterward, in August 2005, Interline entered into an "Import Partnership Agreement" with MTD (USA) Corp. ("MTD"). MTD is a plumbing product company located in Hangzhou, China. Much like Linx, MTD procured Chinese made Toilet

Connectors for Interline with plastic coupling nuts made from the same materials as those procured by Linx.

28.     Up to 2013, MTD obtained the Toilet Connectors for Interline from Chinese manufacturer Zhejiang Dingbo Plumbing Manufacturing Co., Ltd., located in Wenzhov City, China.  Importantly, Interline admittedly had no formal audit process to inspect the Dingbo facility to confirm it was producing quality products.

29.     The Import Partnership Agreement between Interline and MTD, Section 6.1 read as follows: "Prior to the first shipment, [MTD] must provide for [Interline] review and approval, written material specifications, including engineering drawings as requested by [Interline] for all products sold to [Interline]."

30.     Similarly, Section 6.2 of the Import Partnership Agreement provides that "[p]rior to the first shipment [of Toilet Connectors], [MTD] must provide in writing a description of its quality control procedures, including all subcontractor inspection protocols to [Interline] for review and approval."

31.     Despite these express clauses, Interline *never* obtained any product specifications, material specifications, or engineer drawings for the Toilet Connectors nor did it request any description of MTD's quality control procedures prior to distributing the Toilet Connectors throughout the United States.

32.     In 2013, MTD stopped selling the Toilet Connectors to Interline because it had grown weary of having to continue to indemnify Interline for property damage claims related to the repeated failure of the Toilet Connectors' plastic coupling nut.

33.     Interline faces mounting property damage claims related to the spontaneous failure of the Chinese made Toilet Connectors. Indeed, there are presently

218 active claims by property insurers against Interline for subrogation payments made to reimburse for property damages caused by failed plastic coupling nuts. Those claims, in total, demand more than $7.8 million in property damage.

34.     Due to the inherent, uniform defects, the Toilet Connector's plastic coupling suffers a circumferential fracture at its base (as depicted in the pictures above and the exemplars pictured below) allowing pressurized water to flow unabated causing flood and water damage.





35.     These repeated spontaneous circumferential fractures are the direct result of the inferior design and materials used for the Toilet Connector which led to a uniform defect in all Toilet Connectors. The Toilet Connector's plastic coupling nut failed to adhere to the most basic design standards in the plastics industry.

## C. THE DEFECTS WITH INTERLINE'S TOILET CONNECTORS

### i. The Material Selection and Design Create High Localized Stress Resident in the Coupling Nut

36. When using plastics to manufacture and design parts, the plastics industry recognizes that perhaps the most important set of decisions involves the specification of the material. Selection of an appropriate plastic material is vital in product development since the properties of plastic are closely tied not only to the product design but also the process optimization.

37. The Chinese-made Toilet Connectors used the plastic material– "acetal" or "POM" - for the coupling. Acetal, also known as POM, is widely accepted as a "notch sensitive" polymer that is prone to failure due to stress concentration. "Notch sensitivity" is commonly understood to mean the extent to which a material's sensitivity to fracture is increased by the presence of stress inside the part.

38. The selection of a "notch sensitive" polymer for the coupling nuts is compounded because the Chinese-designed plastic coupling nuts contain internal sharp transition points - or notches - that concentrate stress following routine installation.

39. It is a basic understanding in the plastic industry that sharp corners are to be avoided when designing with plastic. Filleting the corners (or rounding) is a recurring rule in plastic product design; but, it is often avoided for cost reasons or simply overlooked. Avoiding sharp corners is important for avoiding stress concentrators. A sharp corner augments localized stresses and creates a preferential site for crack initiation by multiplying stresses where cracking can more easily occur.

40.     Sharp corners are the principal cause of plastic part failure.  Concordantly, when molding plastics, corners should be rounded to reduce stress – compare in the diagram below.



*Sharp corners*                              *Filleted corners*

41.     Additionally, the use of a uniform thickness throughout the plastic part design provides strength and other product quality attributes.

42.     Ultimately, the Chinese-designed plastic coupling nuts suffer from defects, including the material selection (acetal, POM) combined with the internal sharp transition points, and inadequate wall thickness that cause them to fracture in near uniform fashion (as photographed above) after routine installation.

### ii.     High Stress Creates Crazing and Creep Leading To Failure Over Time

43.     "Creep" is an engineering term used to describe the continued deformation or extension of a plastic component that is under a continuous load.  Most people have seen examples of creep in their everyday lives, through plastic fence gates that sag over time due to creep of the hinge material, plastic washers that permanently flatten and change shape over time under compression loads, or polymer ropes that stretch over time when used to support heavy objects.  Creep occurs in all engineering materials, including

metals, plastics, and ceramics; but plastics respond to long term loads differently than metals or ceramics.

44. Under stress, polymer molecules in plastics seek to relieve stress, or relax. If the stresses are small and a plastic component is exposed to stress for only a short period of time, the component will deflect and rebound without suffering any long term damage.

45. If, however, stresses are sufficiently large (e.g., tightening or torqueing to avoid water leaks) and long term stresses exist (e.g., constant pressure resulting from tightening and compression), the plastic molecules inside a plastic part will creep in an effort to relieve stress and relax. Over time, and with constant pressure, the plastic material will microscopically experience "crazing."

46. "Crazing" or crazes are like fine, thin, tiny types of cracks that extend in a plastic part on or under the surface. Crazes are initiated when the external stretch of the plastic material causes a microscopic void to open up at a stress concentration point created by a notch in the material.

47. After the void is opened, the microscopic void will spread in a plane perpendicular to the highest principal stress. When the component's design can no longer withstand the constant pressure – and achieve sufficient relaxation – the crazing will transition to a crack and failure occurs. This type of failure is termed "creep rupture."

48. Creep is so fundamentally relevant to plastic product design that the creep behavior of materials is taught in the most basic engineering courses dealing with materials science, failure analysis, fracture mechanics, polymer physics and product design.

49.     As discussed above, the Interline plastic coupling nuts, through the combination of material selection, sharp corners, and inadequate wall thickness, created internal localized stress imparting significant localized stress into the surrounding polymer material.  These flaws invariably lead to crazing in the plastic coupling nut as the plastic seeks to relax under the load.

50.     Since the stress applied to the nut remains essentially constant during its attachment to the underside of the toilet, the existing microscopic crazes continue to grow and new crazes continue to form in a perpendicular plane as the part seeks to relax.  As the crazes progressively link in the perpendicular plane, a nearly identical circumferential crack is formed within the wall of the nut.

51.     Once the crack in the sidewall forms, the remaining material then experiences instantaneous fracture, and water begins to spray from the fractured nut. Often, the fractured nut completely separates into two pieces as seen below.  These defects could have been easily avoided.



## D.   INTERLINE FAILED TO ENSURE THAT THE TOILET CONNECTORS HAD INSTALLATION INSTRUCTIONS AND WARNINGS

52.     Interline, in placing the DuraPro Toilet Connectors into the stream of commerce, had a duty to provide instructions for safe installation, together with warnings

against over stressing and the possibility of the plastic coupling nut's failure.

53.    As pictured below, the label supplied with Interline's Toilet Connectors

contain _**no**_ installation instructions or warnings, whatsoever.  The installer, with the fear

of leaking water, is free to tighten the coupling nut as much as possible without the

understanding or warning that doing so will increase the stress in the part, lead to creep,

and ultimate failure.



54.    Additionally, not uncommonly, installers will apply a tool to the plastic

coupling (e.g., wrench) to gain additional grip in securing the nut to the toilet's base.  The

use of a tool exacerbates the high level of stress created inside the plastic coupling nut

and almost certainly guarantees failure due to creep rupture.

55.    Not only did Interline fail to provide any installation instructions, the label

also fails to provide any warnings about applying too much torque to the coupling nut.

The label does not warn about: the specific nature of the risks (i.e., spontaneous fracture),

gravity of the risks (i.e., flooding) and how to avoid those risks (i.e., replacement after a reasonable useful life).

56.     Without proper instruction or warning about spontaneous fracture, Plaintiffs and the Class members were left on their own to determine whether, or when, the Toilet Connector should be replaced while affixed to a toilet.

57.     Interline failed to include any mention or reference to the warranty life of the Toilet Connector. Without reference to a warranty, it is a reasonable expectation that the life expectancy of a properly designed Toilet Connector will equal or surpass that of the toilet, unless informed or warned otherwise.

58.     Interline with full knowledge of the repeated failures of the Toilet Connectors has abused its access to information and superior knowledge of the defects associated with the Toilet Connector's plastic coupling.  Interline exploited Plaintiff and the Classes ignorance of these defects and the likelihood that the Toilet Connector will fail resulting in substantial property damage.

E.     **PLAINTIFF AND THE CLASSES HAVE BEEN DAMAGED**

59.     Plaintiff and the Class members have suffered actual harm as a result of Interline's actions because the Toilet Connectors in their homes contain latent defects that caused them to fracture resulting in water leaks and property damage.

60.     The injuries sustained by Plaintiff and the Classes flow from the common facts surrounding Interline's misconduct, including: (1) that the Toilet Connector had defects that lead to spontaneous fracture of the plastic coupling; (2) that the Toilet Connectors were defective for their intended use at the time of sale; (3) Defendants did not provide adequate instruction for installation or warnings urging periodic replacement;

and (4) that Defendants, despite knowing about the Toilet Connectors' defects, failed to provide any public notice or warning about the defective coupling nut design or institute a recall to repair, or replace the defective Toilet Connectors.

61.     The damages suffered by Plaintiff and the Classes include, without limitation, amounts paid for the defective Toilet Connectors; amounts paid to remediate property damage caused by flooding;  together with the cost to replace the defective Toilet Connectors, as well as incidental and consequential damages.

## F.     **ACTIVE CONCEALMENT / EQUITABLE TOLLING**

62.     The inherent defects in the plastic coupling nuts are not perceptible to Plaintiff or other Class members until the coupling nut ultimately fractures and causes water leaks and property damage.  Even after water begins leaking into the property, homeowners cannot determine the nature of the defect without expert assistance.

63.     Because of the facts alleged in the preceding paragraphs, Plaintiff and Class members did not become aware of the defects with the Toilet Connectors until they suffered damages from its failure.

64.     In addition, Interline is estopped to plead the statute of limitations because it failed to disclose facts it was obligated to disclose concerning defects in the Toilet Connectors, actively concealed and misrepresented to Plaintiff and the Classes facts which were essential to understanding that Plaintiff and the Classes had claims against Interline and otherwise acted so as to prevent Plaintiff and the Classes from learning that they possessed claims against Interline.  Had Plaintiff and the Classes been aware of the facts which Interline concealed, they would have commenced suit before the running of any statute of limitations alleged to be applicable to this case.

## CLASS ACTION ALLEGATIONS

65.     Plaintiff brings all her claims as class claims pursuant to Fed. R. Civ. P. 23. The requirements of Fed. R. Civ. P. 23(a), (b)(2), and (b)(3) are met with respect to the Classes defined below.

66.     A Rule 23(b)(2) Class is appropriate when the defendant "has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2).

67.     Declaratory relief is intended to minimize "the danger of avoidable loss and unnecessary accrual of damages." 10B Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2751 (3d ed. 1998).

68.     Interline's failure to warn or acknowledge that their Toilet Connector with a plastic coupling nut contains latent defects that cause fracture resulting in extensive property damage  makes equitable relief with respect to a Rule 23(b)(2) class appropriate.

69.     The Rule 23(b)(2) "Equitable Relief Class" is defined as follows:

> All persons in the United States who (i) purchased
> Defendant's Toilet Connector and/or (ii) own or reside in a
> structure that contains the Toilet Connector.

70.     Plaintiff also proposes a Rule 23(b)(3) "Nationwide Damages Class" defined as follows:

> All persons in the United States who (i) purchased
> Defendant's Toilet Connector and/or (ii) own or reside in a
> structure where Defendant's Toilet Connector plastic
> coupling nut failed and caused damage to property.

71.     Alternatively, Plaintiff proposes a Rule 23(b)(3) "Pennsylvania State Damages Class" defined as follows:

> All persons in the State of Pennsylvania who (i) purchased Defendant's Toilet Connector and/or (ii) own or reside in a structure where Defendant's Toilet Connector's coupling nut failed and caused damage to property.

72.     Excluded from the Classes is Interline, any entities in which Interline has a controlling interest, any of Interline's parents, subsidiaries, affiliates, officers, directors, employees and members of such person's immediate families, the presiding judge(s) in this case and her immediate family, and any class member who has entered into a binding release for their claim with Interline and/or is barred from bringing a claim due to a judgment entered in a court of law pursuant to the doctrines of res judicata and/or collateral estoppel, as well as any Toilet Connectors Interline purchased from Watts Anderson-Barrows, located in Palmdale, California, as those Toilet Connectors are subject to a Release in the class action settlement *Trabakoolas v. Watts Water Technologies, Inc.*, Case No. 12-cv-01172 (N.D. Cal.).

73.     The Classes expressly disclaim any recovery for physical injury caused by a Toilet Connector's coupling nut failure.

### RULE 23(a), (b)(2), and (b)(3) CRITERIA

74.     <u>Numerosity</u>:  Plaintiff is informed and believes that between 2002-2013, Defendant sold approximately eleven million defective Toilet Connectors throughout the United States.   Additionally, Plaintiff believes, and therefore avers, that the Toilet Connectors have failed thousands of times throughout the United States resulting in damages.   Accordingly, the Classes consist of hundreds, if not thousands of persons, making individual joinder of all the Class members impracticable.   The Classes can be

readily identified; Interline's Toilet Connectors can be identified by unique markings on the Toilet Connector itself, together with the labeling affixed to each connector.

75. <u>Commonality</u>: Questions of law and fact are common to the Plaintiff, the Equitable Relief Class, and the Damages Classes, and predominate over questions affecting only individual members, including, *inter alia*, the following:

      (a)     Whether Interline's Toilet Connectors are defective;

      (b)     Whether the Toilet Connector label provides adequate instruction for its installation, its useful life, its warranty, as well as adequate warnings regarding its propensity to fail;

      (c)     Whether Interline owed a duty to warn about the Toilet Connectors' defects;

      (d)     Whether Interline continued to sell the defective Toilet Connector after remediating its design; and

      (e)     Whether Plaintiff and the members of the Damages Classes are entitled to damages.

76. <u>Typicality</u>: Plaintiff's claims are typical of the claims of the Classes described above, and arise from the same course of conduct. The relief Plaintiff seeks is typical of the relief sought for the absent Class members.

77. <u>Adequacy</u>: Plaintiff will fairly and adequately represent and protect the interests of all absent Class members. Plaintiff is represented by counsel competent and experienced in consumer protection, products liability, and class action litigation.

78. <u>The Prerequisites of Rule 23(b)(2) are Satisfied for a Declaratory Relief Class</u>: The prerequisites to maintaining a class action for equitable relief pursuant to Fed. R. Civ. P. 23(b)(2) exist as Interline has acted or refused to act on grounds generally

applicable to the Class thereby making equitable relief appropriate with respect to the Class as a whole. The central issues of whether the Toilet Connectors are defective; and whether the installation instructions are inadequate; are the same for all class members. There is an economy to class treatment of these central questions because their resolution has the potential to eliminate the need for continued and repeated litigation across the country related to the Toilet Connector's alleged defects and the reasons for its repeated failure.

79.     The Prerequisites of Rule 23(b)(3), Predominance and Superiority, are Satisfied for the Damages Classes:  Plaintiff and the Damages Class have all suffered damages as a result of Interline's defective Toilet Connectors.  A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation.  Moreover, absent a class action, most Class members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy at law.

80.     The prosecution of separate actions by the individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members, which would establish incompatible standards of conduct for Interline. In contrast, the conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class member.

81.     Interline's actions are generally applicable to the Classes as a whole, and Plaintiff seeks, *inter alia*, equitable remedies on behalf of a (b)(2) class and damages on behalf of (b)(3) classes.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

**Negligence
on behalf of a Rule23(b)(3) Damages Class;
or alternatively, on behalf of the Pennsylvania State Damages Sub-Class**

82.     Each of the preceding paragraphs is incorporated by reference as though fully set forth herein.

83.     Interline was negligent in that they failed to use reasonable care when they designed, distributed, and sold their Toilet Connectors with plastic coupling nuts.

84.     As the seller of a consumer product, Interline owed a duty to Plaintiff and the putative Class members to provide a safe and quality product, and a duty to provide a product that would perform as it was intended and expected. Interline also owed a duty to Plaintiff and the putative Classes to provide adequate instructions and warnings for proper and safe use of the product.

85.     Interline further owed a duty to provide Plaintiff and the putative Classes with information related to the Toilet Connector's reasonable life-expectancy and information related to its maintenance and replacement.

86.     Defendants breached each one of these duties.

87.     As a direct and proximate result of Interline's negligence, lack of care, and other wrongful acts, Plaintiff and the putative Class members sustained damages.

88.     As a result of Defendants' negligence, Plaintiff and the putative Classes have suffered actual damages in the amounts they have paid to remediate property damage caused from flooding water, together with consequential and incidental damages.

89.     As a direct, proximate and foreseeable result of Interline's negligence, Plaintiff and the putative Class members have been damaged in the aggregate, in an amount to be determined at trial.

## SECOND CAUSE OF ACTION

### Strict Liability-Design Defect and Failure to Warn on behalf of a Rule 23(b)(3) Damages Class, or alternatively, on behalf of the Pennsylvania State Damages Sub-Class

90.     Each of the preceding paragraphs is incorporated by reference as though fully set forth herein.

91.     Interline sold and/or distributed defective Toilet Connectors with plastic coupling nuts to Plaintiff and the putative Classes.

92.     The Toilet Connectors were defective when they left Interline's control and were placed into the stream of commerce.

93.     Interline knew, or should have known, that the Toilet Connectors contained a non-obvious danger in their material. Interline knew that the plastic coupling nut was highly susceptible to failure under expected installation conditions, and that consumers would not replace their Toilet Connectors without an instruction to do so.

94.     Interline failed to inform Plaintiff and the members of the Classes as to the Toilet Connectors susceptibility to failure and warn Plaintiff and class members to replace the Toilet Connectors periodically.

95.     The Toilet Connectors sold and/or distributed by Interline were defective due to inadequate warnings and inadequate inspection and testing, and inadequate reporting regarding the results of quality-control testing and safety inspections, or lack thereof.

96.     Had Plaintiff and the members of the Classes been adequately warned about the likelihood the likelihood that the Toilet Connectors would fail, they would have taken steps to avoid damages by replacing the Toilet Connectors.

97.     As a direct and proximate result of the defective condition of the Toilet Connector sold and/or distributed by Interline, Plaintiff and other members of the Classes have been injured, including water damage to their personal property.

## FOURTH CAUSE OF ACTION

### Declaratory Judgment Act, 28 U.S.C. §2201, *et seq.*
### on behalf of the Rule 23(b)(2) Declaratory Relief Class

98.     Each of the preceding paragraphs is incorporated by reference as though fully set forth herein.

99.     Declaratory relief is intended to minimize "the danger of avoidable loss and unnecessary accrual of damages." 10B Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2751 (3d ed. 1998).

100.    There is an actual controversy between Interline and Plaintiff concerning: (1) whether the Toilet Connectors have a defective condition that leads to fracture of the plastic coupling nut; (2) whether Interline knew, or should have known, of this defective condition; (3) whether the instructions provided by Interline for installation of the Toilet

Connector were inadequate; and (4) whether the Interline failed to warn against over-tightening the plastic coupling nut.

101.     Pursuant to 28 U.S.C. § 2201 this Court may "declare the rights and legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

102.     Despite the repeated failures, Interline has refused to acknowledge that the Toilet Connector with plastic coupling nut is defective and the installation instructions fail to provide adequate direction to safely and properly install the coupling nut to avoid it failing and causing property damage.

103.     Accordingly, because of Interline's failure to act, Plaintiff seeks a declaration that the Defendants' Toilet Connectors with plastic coupling nut are defective in their workmanship, material and labeling.   These defects will cause the plastic coupling to fracture resulting in water damage to property.   The defective nature of the plastic coupling nut is material and requires disclosure to all persons who reside in a structure that contains Interline's defective Toilet Connectors with plastic coupling.

104.     The equitable relief requested herein will generate common answers that will settle the controversy related to the alleged defective Toilet Connector with plastic coupling nut and the reasons for its repeated failure.   There is an economy to resolving these issues as they have the potential to eliminate the need for continued and repeated litigation.

### FIFTH CAUSE OF ACTION

**Unjust Enrichment**
**on behalf of a Rule 23(b)(3) Damages Class, or alternatively,**
**on behalf of the Pennsylvania State Damages Sub-Class**

105.     Each of the preceding paragraphs is incorporated by reference as though fully set forth herein.

106.     Plaintiff and the Class members conferred an economic benefit on Interline by their payment for the Toilet Connectors, because Interline received money for the Toilet Connectors even if it was not the actual end-seller.

107.     Interline appreciated, accepted, and retained this economic benefit to the detriment of Plaintiff and the Class members.

108.     Allowing Interline to retain the economic benefit it received from the Toilet Connector sales would be inequitable to Plaintiff and the Class members because of the wrongful conduct alleged herein.  Interline's retention of the economic benefit it received violates the fundamental principles of justice, equity and good conscience because Interline knowingly sold Plaintiff and the Class members a defective product.

109.     As a result, Plaintiff seeks an Order requiring Interline to disgorge all of the profits, benefits, and other compensation they obtained from the Class members as a result of its wrongful conduct.

## SIXTH CLAIM FOR RELIEF

**Violation of Magnuson-Moss Consumer Products Warranties Act,
15 U.S.C. § 2301, et seq. ("MMWA")
on behalf of a Rule 23(b)(3) Damages Class, or alternatively,
on behalf of the Pennsylvania State Damages Sub-Class**

110.     Each of the preceding paragraphs is incorporated by reference as though fully set forth herein.

111.     The MMWA provides a private right of action by purchasers of consumer products against manufacturers or retailers who, *inter alia*, fail to comply with the terms of an implied or written warranty.  15 U.S.C. § 2310(d)(1).

112.    Interline has failed to comply with its implied warranties with regard to the Toilet Connectors that it sold.

113.    The Toilet Connectors are consumer products, as that term is defined in 15 U.S.C. § 2301(a).

114.    Defendant is a warrantor, as that term is defined in 15 U.S.C. § 2301(5).

115.    Plaintiff and each member of the Classes are consumers, as that term is defined in 15 U.S.C. § 2301(3).

116.    The MMWA provides a cause of action for breach of warranty or other violations of the Act.    15 U.S.C. § 2310(d)(1).    Interline has breached its implied warranty of merchantability, which it cannot disclaim under the MMWA, 15 U.S.C. § 2308(a)(1), by failing to provide merchantable goods.  Plaintiff has suffered damages as a result of Interline's breaches of implied warranties as set forth herein; thus, this action lies.  15 U.S.C. § 2310(d)(1)-(2).

117.    On July 31, 2014, Plaintiff provided Interline written notice of the breach of warranty claims that are raised herein and afforded a reasonable opportunity to cure, but Interline never cured its breach which is common to other members of the Class. Because this is a class action, once Plaintiff's representative capacity is determined, notice and opportunity to cure on behalf of the Class – through Plaintiff – can again be provided under 15 U.S.C. § 2310(e).

118.    Interline provides a generic written warranty contains terms in its catalogs that purportedly limit Interline's liability to the purchaser (retailer, plumber, etc), not the end user (property owner) and only for a period of one year from the date of purchase from Interline.  These terms are inconspicuous to the consumer whose property the Toilet

Connector is ultimately installed, and that lack of conspicuousness violates the MMWA. 15 U.S.C. § 2302(a).

119.    Due to failures and omissions on Interlines' part, Plaintiff did not receive or otherwise have the opportunity to review the written warranty document. Accordingly, any such exclusions and limitations of remedies are unconscionable and unenforceable, and Plaintiff is entitled to the full panoply of remedies available under MMWA and Article 2 of the Uniform Commercial Code as adopted by the states and the District of Columbia.

120.    Interline's acts and omissions in violation of the MMWA are "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce," and they are unlawful.  15 U.S.C. § 2310(b); 15 U.S.C. § 45(a)(1).

121.    Plaintiff has suffered, and is entitled to recover, damages as a result of Interline's breaches of warranty and violations of the MMWA.

122.    Additionally, or in the alternative, the MMWA provides for "other legal and equitable" relief where there has been a breach of warranty or failure to abide by other obligations imposed by the MMWA. 15 U.S.C. § 2310(d)(1).  Plaintiff and the Equitable Relief Class seek declaratory relief relating to the existence of the defects alleged herein.

123.    Plaintiff also seeks and an award of costs and expenses, including attorneys' fees, under the MMWA to prevailing consumers in connection with the commencement and prosecution of this action. 15 U.S.C. § 2310(d)(2).  Plaintiff and the

prospective Class intend to seek such an award, including expert witness costs and other recoverable costs, as prevailing consumers at the conclusion of this lawsuit.

## SEVENTH CLAIM FOR RELIEF

### Breach of Implied Warranty of Merchantability on behalf of a Rule 23(b)(3) Damages Class, or alternatively, on behalf of the Pennsylvania State Damages Sub-Class

124.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

125.    Interline is a merchant who sold and distributed Toilet Connectors for use in residential and commercial property throughout the United States.

126.    By so doing, Interline impliedly warranted to Plaintiff and members of the Class that the Toilet Connectors were free of defects, and were merchantable and fit for the ordinary purpose for which such goods are used, including for residential use.

127.    As alleged herein, Interline's sales of Toilet Connectors breached the implied warranty of merchantability because they were latently defective causing the Toilet Connectors to fracture and fail.  The Toilet Connectors were and are therefore defective, unmerchantable, and unfit for the ordinary, intended purpose at the time of sale.

128.    Any contractual language contained in Interline's written warranty that attempts to limit remedies under the implied warranty of merchantability is unconscionable, fails to conform to the requirements for limiting remedies under applicable law, causes the warranty to fail of its essential purpose, and is, thus, unconscionable, unenforceable and/or void.

129.     The Breach of Implied Warranty of Merchantability laws in the following states do not differ, or differ in an immaterial way, from the laws of Pennsylvania, the state in which Plaintiff Ajose resides and the locus of her harm and losses,, and New Jersey, the state in which Interline is incorporated: Alaska, Arkansas, California, Colorado, Delaware, District of Columbia, Hawaii, Indiana, Kansas, Louisiana, Maine, Maryland, Masachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Mexico, North Dakota, Oklahoma, Rhode Island, South Carolina, South Dakota, Texas, Utah, Virginia, Washington, West Virginia, and Wyoming.  Thus, this claim is likewise asserted on behalf of residents of these states.

130.     As a direct and proximate result of the breach of said warranty, Plaintiff and the Class Members suffered and will continue to suffer losses as alleged herein in an amount to be determined at trial, including full refunds or the replacement of the defective Toilet Connectors with non-defective material of at least the quality and grade marketed and promised, as well as, the cost to remove and replace the defective Toilet Connectors.

131.     Additionally, or in the alternative, Plaintiff and the Equitable Relief Class seek declaratory relief relating to the defect alleged herein and its coverage under the available implied warranties.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, individually and on behalf all others similarly situated, respectfully request that this Court enter a judgment against Interline and in favor of Plaintiff, and grant the following relief:

A.    Determine that this action may be maintained as a Class action with respect to the Classes identified herein; certify a class action pursuant to both Rule 23(b)(2) and (3) with respect to particular issues if appropriate; and designate and appoint the named Plaintiff herein and her counsel to serve as Class Representatives and Class Counsel;

B.    Grant Plaintiff and the Equitable Relief Class members pursuant to Rule 23(b)(2) declaratory, equitable, and/or injunctive relief and require Interline to stop the unlawful, unfair and deceptive conduct alleged herein and/or notify the Equitable Relief Class members about the Toilet Connector defect at Interline's expense, and to pay for replacements of all the defective Toilet Connectors;

C.    Grant Plaintiff and the Rule 23(b)(3) Classes awards of damages in such amount to be determined at trial or as provided by applicable law;

D.    Grant the Plaintiff and the members of the Classes their costs of suit, including reasonable attorneys' fees, and expenses as provided by law; and

E.    Grant the Plaintiff and the members of the Classes such other, further, and different relief as the nature of the case may require or as may be determined to be just, equitable, and proper by this Court.

## JURY TRIAL DEMAND

Plaintiff, by her counsel, requests a trial by jury on those causes of actions set forth herein.

Date: August 19, 2014        By:  _____

J. Gerard Stranch, IV, BPR # 23045
Seamus T. Kelly, BPR # 32202
**BRANSTETTER, STRANCH**
**& JENNINGS, PLLC**
227 Second Avenue North, 4th Floor
Nashville, Tennessee 37201
Telephone:  (615) 254-8801
Facsimile: (615) 255-5419
Email: gerards@branstetterlaw.com
        seamusk@branstetterlaw.com


Simon Bahne Paris
Patrick Howard
Charles J. Kocher
**SALTZ, MONGELUZZI, BARRETT &**
**BENDESKY, P.C.**
One Liberty Place, 52nd Floor
1650 Market Street
Philadelphia, PA 19103
Telephone: (215) 575-3986
Facsimile: (215) 496-0999
Email: sparis@smbb.com
        phoward@smbb.com
        ckocher@smbb.com


Daniel E. Gustafson
Raina Borrelli
**GUSTAFSON GLUEK PLLC**
120 South Sixth Street
Suite 2600
Minneapolis, MN 55402
Telephone: (612) 333-8844
Facsimile: (612) 339-6622
Email: dgustafson@gustafsongluek.com
        rborrrelli@gustafsongluek.com

Anthony D. Shapiro
Jeniphr Breckenridge
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
Email: tony@hbsslaw.com

Joseph J. Tabacco, Jr.
Todd. A. Seaver
**BERMAN DeVALERIO**
One California Street, Suite 900
San Francisco CA 94111
Email: jtabacco@bermandevalerio.com
            tseaver@bermandevalerio.com

Donald L. Perelman
Gerard A. Dever
**FINE, KAPLAN AND BLACK, P.C.**
1835 Market Street, 28th Floor
Philadelphia, PA 19103
Telephone: (215) 567-6565
Facsimile: (215) 568-5872
Email: dperelman@finekaplan.com
            gdever@finekaplan.com

*Counsel for Plaintiffs and the proposed Classes*